**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| CAMPMOR, INC., | : | |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | Civ. No. 09-5465 (WHW) |
| | : | |
| BRULANT, LLC, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |

**Walls, Senior District Judge**

Defendant Brulant, LLC[1] ("Brulant") moves for summary judgment on all claims against plaintiff Campmor, Inc. ("Campmor"). The plaintiff opposes the motion. Pursuant to Rule 78 of the Federal Rules of Civil Procedure, the motion is decided without oral argument. Defendant's motion for summary judgment is granted in part and denied in part.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts viewed in the light most favorable to the plaintiffs are: Campmor is a recreational equipment retailer that operates a retail store in Paramus, New Jersey. (Second Am. Compl. ¶ 3.) Campmor was founded in 1978 by Morton Jarashow. (Jarashow Cert. ¶ 2.) His son Dan Jarashow, the chief executive officer of the company, took primary management

---

[1] Brulant was purchased by Rosetta LLC in 2008, and Rosetta is Brulant's successor-in-interest. The parties refer to Brulant and Rosetta interchangeably. For purposes of this motion, the Court will refer to Rosetta and/or Brulant as "Brulant."

**NOT FOR PUBLICATION**

responsibility in 1981.  (<u>Id.</u>)  Over the years, Campmor supplemented its catalog sales by

developing an internet retail business.  (Second Am. Compl. ¶ 5.)  Campmor states that by 2006

its revenue from website sales exceeded $60 million per year.  (<u>Id.</u>)  Until that time, support for

Campmor's website was provided by Tachyon Solutions.  But Campmor began looking for a

larger, more sophisticated company to assist it in updating and improving its website in order to

become more competitive.  (Second Am. Compl. ¶¶ 28-29; Jarashow Cert. ¶ 4.)  Campmor

contacted IBM, which had made the WebSphere Commerce e-commerce platform its website

used, and IBM recommended Brulant.  (<u>Id.</u>)

On September 25, 2006, Brulant visited Campmor and gave a presentation about its

services.  (Second Am. Compl. ¶ 32; Jarashow Cert. ¶ 5.)  During this presentation, Brulant

represented itself as the "premier WebSphere Commerce partner in the United States," and said

that it had "an extremely close relationship" with IBM that it could "leverage for Campmor."

(Jarashow Cert., Ex. A.)  Also during this presentation, Brulant recommended that Campmor

upgrade its website from the 5.6.1 WebSphere platform to the new 6.0 platform.  (<u>Id.</u> at ¶ 6.)

Campmor chose not to upgrade at that time, but hired Brulant to improve its search engine

optimization[2] ("SEO") and to maintain its 5.6.1 website.  (<u>Id.</u> at ¶ 8.)  Campmor entered into a

Master Services Agreement ("MSA") with Brulant (Df. Ex. C), as well as a Statement of Work

("SOW") which specified the services to be performed.  (Df. Ex. D.)

Campmor alleges that Brulant "intensified its drumbeat" regarding an upgrade to the 6.0

platform, insisting that Campmor's existing site was "rife with technical difficulties."  (Jarashow

Cert. ¶ 10.)  This culminated in an August 16, 2007 presentation, during which Brulant identified

---

[2] Campmor defines search engine optimization as "the process of improving the volume or quality of Internet user traffic that is to directed to [sic] a website by search engines via 'natural' or un-paid ('organic' or 'algorithmic') search results, as opposed to other forms of search engine marketing that more closely resemble paid advertising. The premise of SEO is that the earlier or 'higher' a site appears in the search results list returned by a search engine such as Google, Bing or Yahoo!, the more visitors will 'click on' that site's search result from the results list." (Second Am. Compl. ¶ 17.)

**NOT FOR PUBLICATION**

numerous alleged defects with Campmor's 5.6.1 site.  As example, Brulant said that the data on Campmor's site was "disorganized" and "inconsistent," the "custom code [was] poorly structured," and "error messages [were] excessive and bizarre."  (Jarashow Cert., Ex. B at p. 4.) Brulant also warned that IBM may terminate its provision of free technical support for customers using the 5.6.1 platform.  Brulant said that while no official "end of life" date had been set by IBM, October of 2008 was being discussed.  (Id. at p. 15.)  One of Brulant's principals, Doug Denton, followed up this presentation with an email to Dan Jarashow.  In the email, he said that although the estimated fees through 2009 would be $757,700, the return on investment was "estimated to [be] cash flow positive in August of 2008 and result in additional profits of $2.2 million by the end of 2009.  I have been conservative at every opportunity during the estimation process."  (Jarashow Cert., Ex. D.)

In the fall of 2007, Brulant provided a proposed Statement of Work for the 6.0 upgrade. (Second Am. Compl. ¶ 44; Jarashow Cert., Ex. E.)  Jarashow requested a simpler version that omitted language that he found superfluous and confusing, but retained the essential elements of the agreement.  In January 2008, Brulant and Campmor executed a revised Statement of Work which provided for a launch date in September 2008.  (Second Am. Compl. ¶ 70; Jarashow Cert., Ex. F.)  Details of Brulant's "approach and assumptions" contained in the draft SOW were incorporated by reference.  (Jarashow Cert., Ex. F at p. 2.)  Jarashow was sent a "roadmap" of plans for the website's progress, which projected that the site would be created, tested and launched by September 15, 2008.  (Jarashow Cert., Ex. H.)

Throughout the spring and summer of 2008, Jarashow was assured by Brulant that the project was on schedule.  (Jarashow Cert. ¶ 32.)  However, in September 2008, when the 6.0 site was supposed to go live, Brulant's Adam Cohen and Doug Denton visited Jarashow at

**NOT FOR PUBLICATION**

Campmor's offices.  (Id. at ¶ 33.)  In short, Jarashow was told that the costs were exceeding the

budget, and that the project was far from finished.  (Id.; Second Am. Compl. ¶ 82.)  Jarashow

was shown a model of the 6.0 test site, and he was dismayed to find that the site did not have

elements that he considered critical to the upgrade, including guided navigation and other

enhancements.  (Jarashow Cert. ¶ 35.)  Due to Campmor's seasonal sales patterns, the next

opportunity to launch the new site was March 2009.  (Id. at ¶ 36.)  Around January of 2009,

Campmor began analyzing the 6.0 test and noticed that there was a critical and persistent issue

with "shopping cart" errors, preventing customers from completing a purchase.  (Id. at ¶ 37.)

Despite these issues, Brulant assured Campmor that any remaining bugs would be worked out

once the site went live.  (Id. at ¶ 39.)

      The site went live on March 25, 2009, and there were many problems.  (Id. at ¶¶ 49-50.)

The shopping cart errors persisted, and those customers who were not "bounced" at the shopping

cart stage faced additional errors with credit card processing.  (Id. at ¶ 41.)  There were also

critical errors with the OmniFind search function.  Essentially, when customers used the "search

box" on the website to find an item, the results were irrelevant and useless.  (Id. at ¶ 45.)  Basic

left-hand navigation often resulted in error codes or improper internal search results.  (Id. at ¶

53.)  There were also problems with search engine optimization, and Campmor noticed a "radical

drop-off in traffic to the Campmor site."  (Id. at ¶¶ 54-56.)  Finally, Campmor discovered that

instead of launching the WSC 6.0 Professional edition of WebSphere (the one Campmor

contracted for), Brulant had installed WSC Enterprise edition, which is significantly more

complex and expensive.  (Id. at ¶ 59.)

      On June 16, 2009, Jarashow met with representatives of Brulant and IBM in order to

discuss the issues with the site.  (Id. at ¶ 60.)  At this meeting, Brulant promised to resolve the

**NOT FOR PUBLICATION**

outstanding issues.  According to Campmor, they did not fulfill this promise.  (Id.)  Campmor

ultimately hired another company, Red Baritone, to correct the problems with its website.  (Id. at

¶ 53.)  Campmor claims that in 2009, it "lost tens of thousands of visitors per month from the

preceding year."  (Id. at ¶ 64.)  Campmor also claims to have lost significant revenue in internet

sales.  (Id. at ¶¶ 61-63.)  To date, Campmor has paid Brulant $1,567,707.88 for its work on

upgrading to the 6.0 site, and has paid Red Baritone $417,900.00 to correct the problems caused

by Brulant.  (Id. at ¶ 72.)

**STANDARD OF REVIEW**

Summary judgment is appropriate where the moving party establishes that "there is no

genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(a).  A factual dispute between the parties will not defeat a motion for

summary judgment unless it is both genuine and material.  See Scott v. Harris, 550 U.S. 372, 380

(2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A factual dispute is

genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under

the substantive law, it would affect the outcome of the suit.  See Anderson, 477 U.S. at 248.  The

moving party must show that the non-moving party has failed to "set forth," by affidavits or

otherwise, "specific facts showing that there is a genuine issue for trial."  See Beard v. Banks,

548 U.S. 521, 529 (2006) (citing Fed. R. Civ. P. 56(e)).

Once the moving party has carried its burden under Rule 56, "its opponent must do more

than simply show that there is some metaphysical doubt as to the material facts" in question.

Scott, 550 U.S. at 380 (citing Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87

(1986)).  At the summary judgment stage, the court's function is not to weigh the evidence and

determine the truth of the matter, but rather to determine whether there is a genuine issue of fact

5

NOT FOR PUBLICATION

for trial.  See Anderson, 477 U.S. at 249.  In so doing, the court must construe the facts and

inferences in the light most favorable to the non-moving party.  Curley v. Klem, 298 F.3d 271,

277 (3d Cir. 2002).  To survive a motion for summary judgment, a non-movant must present

more than a mere "scintilla of evidence" in his favor.  Woloszyn v. Cnty. of Lawrence, 396 F.3d

314, 319 (3d Cir. 2005).  The opposing party must set forth specific facts showing a genuine

issue for trial.  See Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir. 2001).

## DISCUSSION

**I.     Breach of Contract Claim**

Pursuant to the Master Services Agreement entered into by the parties on October 1,

2006, their dispute is governed by Ohio law.  See Campmor, Inc. v. Brulant, LLC, Civ. No. 09-

5465, 2010 WL 1381000, at *2-3 (D.N.J. Apr. 1, 2010).  To prove a breach of contract claim

under Ohio law, "a plaintiff must show 'the existence of a contract, performance by the plaintiff,

breach by the defendant, and damage or loss to the plaintiff.'"  Nilavar v. Osborn, 738 N.E.2d

1271, 1281 (Ohio Ct. App. 2000) (citation omitted).

There is clearly a dispute of material fact regarding Brulant's work on Campmor's

website.  Campmor alleges that the site had many problems and the end-result was not what they

had contracted for.  Brulant acknowledges that there were problems with the site, but argues that

Campmor "was well aware that there would be issues when the site went 'live.'"  (Df. Br. at 5.)

Nonetheless, Brulant argues that summary judgment is warranted on the breach of contract claim

because Campmor does not have an expert in web design (or some other expert competent to

testify about the technical aspects of building a website).  Campmor has retained two expert

witnesses in this case: William Kerr, an economist, who will testify regarding damages, and

Brian Cooper, who will testify regarding search engine optimization.  Brulant argues that these

**NOT FOR PUBLICATION**

experts were not hired to, nor did they attempt to, address Campmor's claim that Brulant's work

was deficient and the "upgraded" website designed by Brulant "actually had a lower level of

functionality than the original website that had been utilized by Campmor." (Second Am.

Compl. ¶ 84.) As such, Brulant alleges that Campmor has "no admissible evidence that there

was anything wrong with the fundamentals of the website created and designed by Brulant."

(Df. Br. at 13.)

Brulant's argument loses the forest for the trees. "Absent a state or federal mandate

requiring expert testimony to maintain a claim, the Federal Rules of Evidence are quite clear;

Rule 702 states that if testimony from a qualified expert will assist the trier of fact the court

'may' allow such testimony." Legacy Healthcare Servs., Inc. v. Provident Found., Inc., No. 03-

0515, 2007 WL 275974, at *3 (N.D. Ohio Jan. 26, 2007). Brulant has not cited a single case

where expert testimony was required on a breach of contract claim. The Court finds that such

testimony is not necessary.

Brulant argues that Jarashow and other Campmor executives are not experts in web

design, and are unqualified to testify about their own contract. The Court disagrees. The issue,

quite simply, is whether Brulant delivered what it promised in the contract. Campmor states that

Brulant promised to create a website: 1) with all major components functioning properly, 2) that

compared favorably to market leaders and made Campmor more competitive, and 3) that had

improved Search Engine Optimization while maintaining rankings from Campmor's previous

site. Jarashow and other Campmor employees who were involved with the website project can

testify about their expectations, and how the end result fell short. As example, in Bertsch v.

Lee's Granite, LLC, the plaintiffs hired the defendant to install a granite countertop and

backsplash in their home. No. 09-0021, 2009 WL 4269938, at *1 (Ohio Ct. App. Nov. 20,

**NOT FOR PUBLICATION**

2009).    They were unsatisfied with the result, sued for breach of contract, and the trial court

entered judgment in their favor.  Id. at *2.  The defendant appealed, arguing that expert

testimony was required regarding granite color number variation.  Id.  The appellate court upheld

the judgment below, finding that "expert testimony was not required as the alleged defects were

not highly technical or scientific in nature."  Id. at *3.  The plaintiffs were not experts in granite,

but were competent to testify that they had not received what they contracted for.  Id.  This

testimony was sufficient to support their claim.  Id.  Similarly, here, representatives of Campmor

do not need to know how to build a website themselves in order to know that they did not receive

what they expected.

     Similarly, a jury will be able to understand the testimony.  In 2011, the average juror can

be expected to be familiar with the internet and websites.  He or she knows whether a website is

"user friendly," and can understand that something is wrong with a website when error messages

occur, internal navigation takes you to the wrong place, search results are useless, or purchases

cannot be completed.  An issue that prevents a customer from buying an item is a devastating

problem for a retail website; Jarashow does not need to have a degree in computer science to

explain this, and jurors do not need one to understand it.

     Moreover, there is evidence in the record, viewed in the light most favorable to the

plaintiff, in which Brulant admits liability for breach.  As example:

- In an April 29, 2009 internal Brulant email, Scott Young writes: "Between Campmor
  guys, I am pretty embarrassed on the quality of the site that we created for them.  DJ
  [Dan Jarashow] has very valid points and I believe that his business will increase
  significantly when they are fixed."  (Coleman Cert., Pl. Ex. D.)

- In response, Dave Farzekas writes: "I am shocked that we released anything of this
  nature.  Work that we are having to do [sic] was either completely overlooked, not tested,
  or there was a thought of just throwing something out there and catching up afterwards.  I
  haven't spent energy figuring out why we are at this point, just what to fix.  If anything it

**NOT FOR PUBLICATION**

makes me feel better on where we are with JAB [Jos. A. Bank, another Brulant account]." (<u>Id.</u>, Pl. Ex. E)

- In a May 7, 2009 internal Brulant email, Scott Young writes: "[I]t is totally unacceptable for Rosetta to have a site that has this many quality issues. . . . I think you and I agree that its site and coding issues is the deep rooted problem here. I have spent some time on the site lately and the issues are clearly there and they are clearly issues that we have caused." (<u>Id.</u>)

- In a May 14, 2009 internal Brulant email, Chris Boggs writes: "Organic traffic and conversions are down. . . . We are having some issues with keywords that are no longer addressed on the site due to removal and non-replacement of some old pages. . . . All of its 'kids/children's' terms seem to have tanked, due to lack of redirects from the old pages to the new." [Citing Dave Fazekas of Brulant]: "Testing methodologies are weak ... Lots of ordering issues ... Major defects including shipping issues and credit cards." (<u>Id.</u>, Pl. Ex. F.)

- In a May 20, 2009 internal Brulant email, Chris Boggs writes: "[F]rankly there are way more serious usability/site content issues that are preventing the organic conversions. . . . We got very far with the 5.6 version of this site, yet from the redirects, error page and URL standpoint we are almost back to square one for many of the pages on the site. This is due to decisions that were made during the launch process to de-prioritize SEO requests." (<u>Id.</u>, Pl. Ex. G.)

In light of these communications, it is incredibly disingenuous for the defendant to argue that "Campmor has failed to adduce any evidence of a breach by Brulant" because such evidence could only come from an expert. (Df. Br. at 17.) Brulant attempts to minimize these emails by saying that the authors were merely using "colorful language" to "discuss the problems associated with the launch of Campmor's 6.0 website." (Df. Reply, p. 3.) Brulant employees were "simply repeating to their colleagues what the client (Campmor) was complaining about." (<u>Id.</u>) Brulant argues that these emails are evidence of ongoing efforts "to identify, troubleshoot and remedy issues" with the site. (<u>Id.</u>) The Court finds that there is an indisputable issue of material fact in that regard, and expert testimony is not required. Brulant's motion for summary judgment on Count I (breach of contract) and Count II (breach of warranty) of the second amended complaint is denied.

**NOT FOR PUBLICATION**

## II.   <u>Limitation of Liability Clause</u>

All SOWs entered into by the parties were subject to the terms of the MSA.  The MSA is governed by Ohio law, and contains the following clause:

> **Limitation of Liability**: Our maximum liability relating to services rendered under this Agreement (regardless of form of action, whether in contract, negligence or otherwise) shall be limited to the charges paid to us for the portion of services of work products giving rise to liability. Neither of us will be liable to the other for incidental, indirect, consequential or punitive damages or lost profits even if aware of their possible existence.

Brulant argues that the "limitation of liability clause in the Agreement is akin to a liquidated damages clause," and focuses its argument upon this supposed analogy.  In fact, the two are clearly distinguishable under Ohio law.  "A contractual limitation of liability to an agreed maximum of recovery is not a liquidated damages provision."  <u>Superior Integrated Solutions, Inc. v. Reynolds and Reynolds Co.</u>, No. 09-314, 2009 WL 4135711, at *2 (S.D. Ohio Nov. 23, 2009) (citation omitted).  The enforceability of each type of clause is governed by a completely different test.  <u>See</u> <u>Solid Gold Jewelers v. ADT Sec. Sys., Inc.</u>, 600 F. Supp. 2d 956, 959 n.2 (N.D. Ohio 2007) (comparing the tests for enforceability of a liquidated damages provision versus a liability limitation clause).

The clause at issue is clearly a limitation of liability clause.  It is labeled as such, and substantively, it limits Campmor's recovery "to the charges paid to [Brulant] for the portion of services of work products giving rise to liability."  "While viewed critically by the courts, limitation of liability clauses (including exculpatory clauses) may be freely bargained for in Ohio."  <u>Nahra v. Honeywell, Inc.</u>, 892 F. Supp. 962, 969 (N.D. Ohio 1995) (citations omitted). "Absent important public policy concerns, unconscionability, or vague and ambiguous terms, [such] provisions will be upheld, so long as the party invoking the provision has not committed a

**NOT FOR PUBLICATION**

wilful or reckless breach." Id. (citations omitted).   Campmor does not argue that the clause

violates public policy, is unconscionable, or is vague or ambiguous.  Rather, Campmor argues

that there is evidence that Brulant committed an intentional or reckless breach of contract.

  While the Ohio case law on this topic is sparse, the Court finds that there is evidence in

the record from which a jury could find that Brulant was reckless.  According to the Supreme

Court of Ohio, "[a]lthough a limitation-of-liability clause for damages caused by one's own

negligence may be valid and enforceable, it is ineffective where the party to the contract seeking

protection under the clause has failed to exercise any care whatsoever toward those to whom he

owes a duty of care." Richard A. Berjian, D.O., Inc. v. Ohio Bell Tel. Co., 375 N.E.2d 410, 416

(Ohio 1978).  Viewed in a light most favorable to the plaintiff, the internal Brulant emails

discussed earlier could show that Brulant "failed to exercise any care whatsoever" toward

Campmor.  In one email, a Brulant employee wrote that he was "shocked that we released

anything of this nature.  Work that we are having to do [sic] was either completely overlooked,

not tested, or there was a thought of just throwing something out there and catching up

afterwards."  (Coleman Cert., Pl. Ex. D.)  To a jury, this email could demonstrate that Brulant

was aware of its contractual obligations, but disregarded them as it "threw" together a website

with components that were "completely overlooked" and "not tested," in the hopes of "catching

up afterwards."  A jury could find that such performance was reckless.  The Court will not

dismiss Campmor's lost profits claim based on the limitation of liability clause in the MSA.

**III.**  **Evidence of Lost Profits**

  Brulant argues that even if Campmor is permitted to pursue its lost profits claim,

Campmor has not adduced evidence of any lost profit damages.  Brulant asserts that Campmor

"has failed to produce any evidence of lost sales due to any of the particular issues associated

**NOT FOR PUBLICATION**

with the 6.0 version of its website," and goes on to produce a laundry list of highly specific issues for which it alleges Campmor has no evidence of damages.  (Df. Br. at pp. 17-22.)

Brulant's argument is meritless.  Campmor has retained an economist, Dr. William Kerr, as an expert witness.  He has filed an expert report concerning Campmor's damages, and will testify regarding same.  Brulant has not challenged Dr. Kerr's qualifications nor moved to preclude his testimony.[3]  As such, this Court would be completely remiss to grant Brulant's motion for summary judgment on this point due to "lack of evidence."

Under Ohio law, "[i]t is well established that proof of lost profits must be established with reasonable certainty."  Rubbermaid, Inc. v. Hartford Steam Boilers Inspection Co., 645 N.E.2d 116, 118 (Ohio Ct. App. 1994) (citation omitted).   "Reasonable certainty" does not require an itemized list with exact dollar amounts attached to each individual problem with the website.  See Charles R. Combs Trucking, Inc. v. Int'l Harvester Co., 466 N.E.2d 883, 887 (Ohio 1984) (stating that a "plaintiff's evidence of lost future profits as an item of compensatory damages need only be reasonable, not specific."); Rubbermaid, 645 N.E.2d at 119 (finding that plaintiff was not required to "present evidence concerning actual lost sales to specific customers").  Brulant's arguments that Campmor's decline in sales coincided with the recession, or that Campmor was aware that they were not going to receive a "perfect" website are, in a word, irrelevant.  If Brulant disputes Campmor's lost profit claims, it is free to challenge them at trial.

Brulant's motion for summary judgment on this issue is denied.

---

[3] Brulant has moved to preclude the testimony of Brian Cooper, Campmor's expert on search engine optimization. The Court addresses that motion separately.

**NOT FOR PUBLICATION**

IV.     **Campmor's Ohio Fraud Claims**

Count Three of Campmor's amended complaint alleges fraud, and the parties' arguments

focus upon fraudulent inducement.[4]  To establish a claim for fraudulent inducement, a plaintiff

must show:

> (1) a false representation concerning a fact or, in the face of a duty to
> disclose, concealment of a fact, material to the transaction; (2) knowledge
> of the falsity of the representation or utter disregard for its truthfulness; (3)
> an intent to induce reliance on the representation; (4) justifiable reliance
> upon the representation under circumstances manifesting a right to rely;
> and (5) injury proximately caused by the reliance.

Metro. Life Ins. Co. v. Triskett Illinois, Inc., 646 N.E.2d 528, 532 (Ohio Ct. App. 1994).  "Where

the allegation is fraud, summary judgment may be granted unless there is sufficient probative

evidence produced which, if believed, would clearly and convincingly establish fraud."  Moore,

Owen, Thomas & Co. v. Coleman Coffey, 992 F.2d 1439, 1446 (6th Cir. 1993).

Brulant argues that, due to the integration clause in the MSA, Campmor's claims are

barred by the parol evidence rule.  However, the Court previously addressed this argument on

Brulant's motion to dismiss, noting that "an exception to the parol evidence rule exists when a

party asserts a claim of fraudulent inducement or negligent misrepresentation."  Campmor, Inc.

v. Brulant LLC, Civ. No. 09-5465, 2010 WL 1381000, at *6 (D.N.J. Apr. 1, 2010) (citation

omitted).  This exception "does not lose its force merely because the considered written

agreement contains an integration clause."  Id. (citation omitted).  The exception would only lose

its force if the alleged inducement to sign the contract was a promise, "the terms of which are

directly contradicted by the signed writing."  Id. (citation omitted).  Brulant has still not shown

that the Agreement contains any provisions directly contradicting the alleged misrepresentations

---

[4] In any event, "[i]t has been said that the elements of fraudulent inducement are essentially the same as those for
fraudulent misrepresentation, fraudulent concealment, and fraudulent nondisclosure."  Isaac v. Alabanza Corp., No.
05-JE-55, 2007 WL 901596, at *4 (Ohio Ct. App. Mar. 22, 2007) (citation omitted).

**NOT FOR PUBLICATION**

upon which Campmor claims that it relied in entering into it.  The Court again finds that the

parol evidence rule does not preclude Campmor from advancing its fraudulent inducement or

negligent misrepresentation claims.

Campmor argues that Brulant made several false misrepresentations, including: 1) its

claim that it had a "special relationship" with IBM, 2) its prediction that IBM would terminate

support for WebSphere 5.6.1 and impose an "end of life" fee, 3) projections regarding the project

budget and Campmor's anticipated profits, and 4) misrepresentations regarding its expertise and

capabilities.  Brulant argues that it is entitled to summary judgment because there is no evidence

that it knowingly provided a material misrepresentation of fact.

The general rule is that "fraud cannot be predicated on a representation concerning a

future event."  Link v. Leadworks Corp., 607 N.E. 2d 1140,1145 (Ohio Ct. App. 1992).  "Mere

predictions about the future, expectations, or opinions are not fraudulent misrepresentations

unless those opinions are fraudulently made."  Id.  As one court explained:

> A mere promise to perform an act in the future is not, in a legal sense, a
> representation, and a failure to perform it does not change its character.
> Moreover, a representation that something will be done in the future, or a
> promise to do it, from its nature cannot be true or false at the time when it
> is made.  The failure to make it good is merely a breach of contract, which
> must be enforced by an action on the contract, if at all.

Schift v. Rice Mazda Motor Am., Inc., 102 F. Supp. 2d 891, 902 (S.D. Ohio 2002).  The

exception to this rule occurs when the person "who makes his promise of future action,

occurrence, or conduct" has no intention of keeping the promise at the time he makes it.  Martin

v. Ohio State Univ. Found., 742 N.E.2d 1198, 1205 (Ohio Ct. App. 2000) (citation omitted).  In

such a case, "the requisite misrepresentation of an existing fact is said to be found in the lie as to

his existing mental attitude and present intent."  Id. (citation omitted).

14

NOT FOR PUBLICATION

Campmor first alleges fraud in Brulant's representation that it had a "special relationship" with IBM.  In Brulant's September 25, 2006 presentation to Campmor, Brulant stated that it had "an extremely close relationship with the IBM WebSphere Commerce Lab and the WebSphere Commerce Group that we can leverage for Campmor."  (Jarashow Cert., Ex. A.)  Campmor acknowledges that when it was looking for a "larger, more sophisticated company to assist [it] in updating and improving its website" it sought a recommendation from IBM -- and IBM recommended Brulant.  (Jarashow Cert., ¶ 4.)  There is no evidence to show that Brulant fabricated a relationship with IBM; indeed, the evidence indicates that such a relationship existed.  Brulant's representations to Campmor that it could utilize this relationship on Campmor's behalf were not fraudulent; these statements were merely promises or expectations about the future.  There is no evidence that Brulant knew these statements were false when they were made.

Similarly, Brulant's predictions regarding "end of life" for WebSphere 5.6.1, and its estimates regarding Campmor's costs and profits, were just that – predictions and estimates. Such statements are not a basis for fraud.  In its August 16, 2007, presentation, Brulant stated "no official 'end of life' date [has been] set by IBM, but October 2008 is being discussed." (Jarashow Cert., Ex. B.)  Brulant also stated that "[a]fter-life support from IBM is $25k/month." (Id.)  Campmor alleges that these statements were fraudulent because Brulant was incorrect; IBM did not end support for version 5.6.1 until September 30, 2010.  (Jarashow Cert., ¶ 19.) Campmor places much emphasis on the fact that it relied upon Brulant's representations in making its decision to upgrade.  However, this reliance is irrelevant, because Brulant's statement was clearly a prediction.  There is no evidence that Brulant knew that "end of life" would not occur until 2010, or otherwise knew that the statement was false when it was made.  The same

**NOT FOR PUBLICATION**

can be said for Brulant's estimates regarding the project budget, and Brulant's prediction that

"the ROI is estimated to be 'cash flow positive' in August 2008 and result in additional profits of

$2.2mm by the end of 2009." (Jarashow Cert., Ex. D.) As the courts have explained:

> Estimates are not representations capable of constituting fraud. They are
> predictions of the future which are, by definition, opinions or rough
> calculations. Thus, as a matter of law, they are not representations of fact.
> Nor, as a matter of law, can they be reasonably relied upon in a claim
> alleging fraudulent inducement to contract.

Micrel Inc. v. TRW Inc., Civ. No. 02-2539, 2005 WL 1176057, at *8 (N.D. Ohio May 17, 2005)

(citations omitted). Brulant's statements were clearly estimates and predictions, and do not

constitute fraud.

Finally, Campmor alleges that Brulant fraudulently misrepresented its qualifications and

expertise. Campmor places significant emphasis upon Brulant's representation that it would use

"best practices" in upgrading the site to the 6.0 version – a phrase commonly used throughout

Brulant's presentations and which also appears in the SOW. The parties dispute the meaning of

"best practices." "Best practices" is a nebulous term used across many industries and disciplines.

"Best practices are generally-accepted, informally-standardized techniques, methods or processes

that have proven themselves over time to accomplish given tasks." Wikipedia, Best Practice,

http://en.wikipedia.org/wiki/Best_practice (as of June 7, 2011, 19:30 GMT). Best practices are

"considered by some as a business buzzword, used to describe the process of developing and

following a standard way of doing things that multiple organizations can use." Id. Campmor

alleges that Brulant claimed to have a mastery of "best practices" and that these claims were a

"song and dance that not even Brulant believed." (Pl. Br. at 27.)

Campmor cites Kinda Wood USA v. MGV Enterprises LLC for the proposition that

"there is a point where misrepresentations of expertise go beyond puffery." No. 07-1137, 2009

**NOT FOR PUBLICATION**

WL 649793 (S.D. Ohio Mar. 10, 2009).[5]  There, the defendant's motion to dismiss was denied because he represented to the plaintiff that he was an "expert in good standing" in the recycling industry, when in fact he had been "disqualified from managing a business in England for a period of eleven years as a result of fraudulent activities."  Id. at *1-3.  The court simply found that the plaintiff had "stated a claim for fraud, sufficient to withstand Rule 12(b)(6) dismissal."  Id. at *3.  In another case involving alleged misrepresentation of expertise, Word of God Church v. Stanley, the plaintiff hired the defendants to construct a new church.  No. 07-4467, 2011 WL 1641714, at *1 (Ohio Ct. App. Apr. 29, 2011).  The defendants represented that they had experience erecting large, steel commercial buildings, and that they were qualified to build the church.  Id. at *8.  In reality, the record showed that the defendants "had little experience performing the scope of work [the plaintiff's] project required."  Id.  Almost all of the work that the defendants had done together was residential remodeling.  Id.  As a result, the court rejected the defendant's "argument that the trial court erred in failing to direct a verdict in his favor on the issue of fraud."  Id. at *7.

      The facts here are distinguishable from those cases.  Campmor does not dispute that Brulant "specializes in internet marketing and is in the business of providing services to businesses with regard to online retail operations."  (Df. Br. at 1.)  Campmor had significant earlier dealings with Brulant; Brulant maintained Campmor's 5.6.1 website from 2006 to 2009.  Campmor insists that Brulant's promises about "best practices" meant that it "would deliver the 'best' results for the premium prices being charged."  (Pl. Br. at 27.)  However, there is simply no evidence that Brulant knowingly misrepresented its experience or capabilities, or that it did not intend to build Campmor a website using "best practices."  Even Campmor representatives

---

[5] The Court notes that the case cited by Kinda Wood was a 1916 Supreme Court case that had nothing to do with expertise; it was a mail fraud case involving sellers' misrepresentations of 10-acre plots of farmland in Florida. United States v. New South Farm & Home Co., 241 U.S. 64, 505-06 (1916).

**NOT FOR PUBLICATION**

concur on this point. Campmor's Chief Technology Officer Erich Eyler stated during his

deposition:

> Q:   Sitting here today, do you have any knowledge or evidence – whether its
> documents or statements – that anything that anyone at Brulant said to you that
> Brulant knew at the time they said it was false?
>
> A:   I don't believe that anything Brulant said at the time, that they believed was false.
>
> Q:   So it was only later on that it – something might have turned out – at least in
> Campmor's mind – turned out to be inaccurate. But not that Brulant purposely
> said anything in advance that it knew was false or inaccurate?
>
> A:   I would say that's correct.

(Eyler Dep., Df. Ex. B, pp. 166-67.) Also, Campmor's Executive Vice-President, William

O'Donnell, stated the following:

> Q:   [With regard to ¶59 of the 2 Am. Compl.] … This identifies that, and I'll
> paraphrase – that Brulant knew or should have known that it lacked in-house
> expertise to implement 6.0. What I'm asking you is, do you have any evidence or
> knowledge that Brulant knew it did not have expertise? Not whether it was
> implemented correctly or not, but that Brulant knew in advance that it would have
> the expertise?
>
> A:   I guess that would be a no.
>      ….
>
> Q:   Of all the things, as general as they are, of things that you believe or Campmor
> believes that Brulant did improperly, didn't do to the best of their ability, did not
> do what was promised, do you have any evidence that they fraudulently did that?
> And I'll explain that, that they knew that they could not fulfill that or that they
> purposely didn't do those things, as opposed to things that they didn't do up to the
> level you expected?
>
> A:   No.

(O'Donnell Dep., Df. Ex. I, pp. 254-61.) In order to be the basis for an action for fraud, "the

alleged misrepresentation cannot be predicated solely upon a promise to perform that

subsequently is unfulfilled." Wall v. Firelands Radiology, Inc., 666 N.E.2d 235, 243 (Ohio Ct.

App. 1995). "The mere proof of non-performance does not prove a lack of intent to perform."

**NOT FOR PUBLICATION**

(internal quotation marks and citation omitted).  Here, Campmor's allegations amount, at most, to breach of contract.  Campmor has adduced insufficient evidence of fraud.  Brulant is entitled to summary judgment on Count III of the second amended complaint for fraud.

    **V.**       **New Jersey Consumer Fraud Act**

        Count V of Campmor's second amended complaint is for fraud under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2 *et seq*. ("NJCFA").  Brulant argues that Campmor cannot bring a claim under New Jersey law because the MSA provides that the parties' dispute will be governed by Ohio law.  The Court does not reach that question, because Campmor is unable to prove fraud under the NJCFA.

        The standard for fraud under the NJCFA is materially similar to the test for common law fraud in Ohio.  To state a claim for fraud under the NJCFA, "a plaintiff must allege that the defendant engaged in an unlawful practice that caused an ascertainable loss to the plaintiff." Frederico v. Home Depot, 507 F.3d 188, 202 (3d Cir. 2007) (citing Cox v. Sears Roebuck & Co., 647 A.2d 454, 462-465 (N.J. 1994)).  Unlawful practices consist of affirmative acts, knowing omissions or regulations violations.  See Cox, 138 N.J. at 17.  When the violation consists of an affirmative act, the plaintiff need not prove that the defendant intended to commit an unlawful act.  See id.; see also Strawn v. Canuso, 140 N.J. 43, 60 (1995).

        Under the NJCFA, much like Ohio law, "[s]tatements as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong." Alexander v. CIGNA Ins., 991 F. Supp. 427, 435 (D.N.J. 1998) (citation omitted).  The exception to this rule occurs when the defendant has no intention to fulfill the promise at the time it is made.  Id.  Opinions, estimates, and other representations concerning future events "are not assurances of fact and thus do not

**NOT FOR PUBLICATION**

constitute misrepresentations."  See Alexander, 991 F. Supp at 435-36 (finding that statements predicting the future, such as "COMPAR would take CIGNA into the twenty-first century and beyond" could not serve as basis for a fraud claim); see also VT Investors v. R & D Funding Corp., 733 F. Supp. 823, 838 (D.N.J. 1990) (holding that statement that company in which plaintiffs invested would quickly generate positive cash flow exceeding $60,000 per month was non-actionable "puffery" because it was a statement of opinion).

The factual base of Campmor's NJCFA claim is the same as that of its fraud claim under Ohio law.  Campmor has insufficient evidence to sustain a claim for fraud under Ohio law; similarly, it cannot sustain a claim for fraud under the NJCFA.  Brulant's motion for summary judgment on Count V of the second amended complaint is granted.

### VI.   Negligent Misrepresentation

Brulant has moved for summary judgment dismissing Campmor's second amended complaint in its entirety.  However, Brulant has failed to address Campmor's claim for negligent misrepresentation, which is Count IV.  Brulant's brief contains no argument on this point.  A party moving for summary judgment must identify each claim or defense on which summary judgment is sought.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of identifying evidence which shows the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Brulant has failed to meet its burden, and its motion for summary judgment on this count is denied.

### VII.   Unjust Enrichment

Brulant has filed a cross-motion for summary judgment on its unjust enrichment claim. Brulant asserts that Campmor stopped paying its invoices in March/April 2009, and that Campmor claims that it need not pay Brulant for its services because Brulant breached the

**NOT FOR PUBLICATION**

contract.  Brulant argues that "[i]f the Court finds in favor of Brulant . . . that Campmor cannot

prove its claim for Breach of Contract, then Brulant is entitled to summary judgment" on its

unjust enrichment claim.  (Df. Br. at 38.)  The Court has found that there is a material dispute of

fact regarding Campmor's breach of contract and breach of warranty claims.  As such, there is

also a dispute of fact regarding Brulant's counter-claim for unjust enrichment, and Brulant's

cross-motion for summary judgment is denied.

**CONCLUSION**

Brulant's motion for summary judgment on Count I (breach of contract), Count II (breach

of warranty) and Count IV (negligent misrepresentation) of Campmor's second amended

complaint is denied.  Brulant's motion for summary judgment on Count III (fraud) and Count V

(fraud under the NJCFA) is granted.

**<u>s/ William H. Walls</u>**
United States Senior District Judge
